[Cite as *State v. Montgomery*, 2013-Ohio-4193.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 99452**

# STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

# DANIEL F. MONTGOMERY

DEFENDANT-APPELLANT

## JUDGMENT:
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-433325

**BEFORE:** Stewart, A.J., Jones, J., and E.A. Gallagher, J.

**RELEASED AND JOURNALIZED:** September 26, 2013

**ATTORNEYS FOR APPELLANT**

Barry W. Wilford
Sarah M. Schregardus
Kuras, Wilford & Schregardus Co., L.P.A.
492 City Park Avenue
Columbus, OH   43215


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

BY:   Mary H. McGrath
         Saleh S. Awadallah
Assistant County Prosecutors
The Justice Center
1200 Ontario Street, 8th Floor
Cleveland, OH   44113

MELODY J. STEWART, A.J.:

{¶1} In 2003, defendant-appellant Daniel Montgomery,[1] who was assigned to work at St. Stanislaus Church in Cleveland, confessed to murdering the church's pastor, Reverend William Gulas, and setting fire to the parish rectory in order to cover up the murder. To avoid a possible death penalty, he pleaded guilty to murder and arson. He now seeks to withdraw that plea, claiming that he entered the plea under duress and unaware that his attorney knew of the existence of exculpatory evidence. When one of his trial attorneys filed an affidavit contradicting the claim that counsel failed to inform Montgomery about potential exculpatory evidence, Montgomery asked the court to strike the affidavit on grounds that it divulged privileged attorney-client communications. The court denied the motion to strike and then denied the motion to withdraw the guilty plea on grounds that most of the claims raised were res judicata because they could have been raised in earlier proceedings.

{¶2} We find that the court correctly refused to strike the affidavit, but for different reasons than those given by the court — by raising an ineffective assistance of counsel claim in postconviction proceedings, Montgomery waived the attorney-client privilege. We also agree with the court that issues raised in the motion to withdraw the guilty plea, even those that claimed actual innocence, could have been raised in earlier

---

[1] Montgomery was known as "Brother Dan." The record indicates that he is referred to as a Brother in the Franciscan order of priests, a Friar, and a formation student in the order.

proceedings and were res judicata. We thus affirm the court's refusal to permit Montgomery to withdraw his guilty plea.

I

{¶3} Montgomery was assigned to St. Stanislaus as a tutor in the church school. In December 2002, he received a 12:30 p.m. telephone call from a parishioner and went to the pastor's office to get a telephone number. As he entered the office, he saw smoke and flames. He went back to his room and told the caller that he did not know the number. He then called 911 to report a fire. Montgomery remained on the scene to console parishioners and pray for the safety of the pastor, who could not be located. As firefighters put out the fire, they discovered the pastor's body in the rectory office.

{¶4} The day after the fire, the police questioned Montgomery as part of an arson investigation. That questioning did not go well. The police found it odd that Montgomery was unable to say what he had been doing in the 15 minutes before he discovered the fire. He recalled with clarity events outside that frame of time on the day of the fire, but claimed to have no memory of his activities immediately before he entered the church office. As the questioning continued, the police were informed that the coroner had determined that the pastor did not die as a result of the fire, but had instead died from a gunshot wound to the neck.

{¶5} Now that they were investigating a murder, the police accused Montgomery of being less than truthful with his responses regarding his whereabouts before he reported the fire. Montgomery put his head down and said that he needed help. The

police asked him if he owned a gun, and Montgomery began searching his wallet to show the police a receipt for a gun. There was no receipt. The police again told Montgomery that he was not being truthful about his activities in the 15 minutes before he claimed to have discovered the fire. Montgomery again put his head down and said that he needed help.

{¶6} Montgomery told the police that his career as a Franciscan was unraveling. He had been accused by some students of inappropriately touching them, been banned from the church school, and was being transferred to an Indiana friary where he would work in a home for retired Franciscan clergy. "Sad and angry" over these orders, he wanted to "hurt someone." On the day before the fire, he said he went to a local convenience store that supposedly maintained a drug trade and purchased a loaded handgun from the clerk at the counter.

{¶7} The following day, at 12:15 p.m., Montgomery took his gun to the pastor's office. The pastor was sitting at his desk. Montgomery told the pastor, "I can't fucking take this anymore" and fired a single shot. He claimed to see blood streaming down the pastor's chest. Montgomery dropped the gun, found a lighter, and set fire to some papers in the office. He then returned to his room and fell asleep, only to be awakened by the parishioner's telephone call. The caller requested a telephone number that the pastor would know, so Montgomery went to the pastor's office and discovered the fire. He then called 911 to report the fire.

**{¶8}** The state charged Montgomery with felony murder and aggravated arson. In October 2003, he pleaded guilty to murder and arson with an agreed sentence of life with parole eligibility after a minimum of 24 years.

**{¶9}** In December 2003, Montgomery filed a delayed appeal. Appellate counsel certified that there was no merit to the appeal and, under the authority of *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), filed a motion to voluntarily dismiss the appeal. We granted the motion and dismissed the appeal.

**{¶10}** In October 2004, Montgomery filed a pro se motion for DNA testing of the bullet recovered from the pastor's body. He claimed that his DNA would not be on the bullet, so "it would be impossible for me to have used a firearm to shoot the victim." He further argued that if he did not shoot the victim, "I would not have set the fire, making me innocent of aggravated arson." The state opposed DNA testing under former R.C. 2953.82(D), which at that time stated that the prosecuting attorney's disagreement with an inmate's request for DNA testing was "final and is not appealable by any person to any court[.]" The court did not rule on this motion.

**{¶11}** In November 2006, Montgomery filed a petition for postconviction relief and a motion for resentencing. Both motions sought resentencing on grounds that the court imposed more than the minimum sentence and imposed consecutive sentences in violation of the United States Supreme Court decision in *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), which held that any sentence beyond the statutory minimum that required judicial finding of facts not proven to a jury beyond a

reasonable doubt or admitted by the defendant was unconstitutional. The state opposed the petition on grounds that Montgomery pleaded guilty to an agreed sentence and that *Blakely* could not be applied retroactively.

{¶12} At the same time he filed his petition for postconviction relief, Montgomery filed an application to reopen his direct appeal, asserting that appellate counsel was ineffective for failing to raise sentencing issues relating to his receiving more than the minimum prison term and consecutive sentences. We treated the application as a motion to reconsider the dismissal of the prior appeal and granted the motion. We then held, consistent with other appellate districts, that Montgomery's agreed sentences foreclosed appellate review concerning the length of his sentence. *See State v. Montgomery*, 8th Dist. Cuyahoga No. 83914, 2008-Ohio-443, ¶ 6. We also rejected a claim that trial counsel was ineffective for allowing Montgomery to accept a plea bargain to more than the minimum term and to consecutive sentences. *Id*. at ¶ 17.

{¶13} In July 2011, Montgomery filed a motion to withdraw his guilty plea. Recanting his confession, he argued his actual innocence. He also argued that the state withheld exculpatory evidence, the existence of which would have proven his innocence. Finally, Montgomery argued that trial counsel failed to investigate the evidence and ignored his desire to retract his plea and go to trial.

{¶14} The motion to withdraw the guilty plea cited seven different "problems" with the state's case: (1) the murder weapon was not found and Montgomery's story about how he purchased the gun was refuted by the store owner who denied employing

anyone matching the description of the clerk who allegedly sold Montgomery the gun; (2) there was evidence that a church lock box used to store bingo receipts had been opened and burned currency was found at the scene of the fire, thus suggesting that the pastor had been robbed, even though the police had no evidence that Montgomery committed this robbery; (3) the state failed to divulge evidence that the pastor's cell phone was later found in the possession of someone from outside the church, suggesting that the pastor's cell phone had been taken by the robber; (4) the coroner found evidence of blunt trauma to the pastor's head, suggesting that he had struggled with the murderer; (5) the police disregarded evidence that a church employee may have been present at the church at the time of the murder and that this person had financial difficulties that provided a motive for committing a robbery; (6) there was no gunshot residue on Montgomery's clothing consistent with his having fired a gun; and (7) Montgomery's interrogation was "a model of unreliability."

{¶15} The state opposed the motion to withdraw the guilty plea on grounds that Montgomery had grossly distorted the facts; that his claims could have been raised on direct appeal; and that he failed to establish the existence of a manifest injustice sufficient to permit the court to allow him to withdraw the plea. To support its argument that Montgomery failed to show a manifest injustice in the state's failure to disclose exculpatory evidence, the state appended an affidavit from one of Montgomery's trial attorneys. That attorney stated that he received full discovery on all of the "problems"

raised in the motion to withdraw the guilty plea and that he shared that discovery with Montgomery.

**{¶16}** Montgomery filed a motion to strike his trial attorney's affidavit on grounds that it violated R.C. 2317.02(A), that prohibits an attorney from testifying concerning a communication made to the attorney by a client or the attorney's advice to a client. The state opposed the motion by arguing that the affidavit did not contain any communications by Montgomery to trial counsel and that Montgomery had, in any event, waived the attorney-client privilege by raising a postconviction ineffective assistance of counsel claim. The court denied the motion to strike the affidavit because it found that the affidavit did not reveal any communications between Montgomery and trial counsel.

**{¶17}** The court denied the motion to withdraw the guilty plea finding it was barred by res judicata. The court held that "[e]ach claim raised in Montgomery's conclusions as stated in his Corrected Motion to Withdraw Guilty Plea were facts in existence and known to Montgomery at the time of his plea, sentencing, and subsequent direct appeal and petition for postconviction relief." The court also found no basis for concluding that the state withheld exculpatory evidence of cell phone records, noting that "Montgomery does not dispute that the records were, in fact, provided to defense counsel." Finally, it found that claims of ineffective assistance of counsel relating to the guilty plea and Montgomery's fabricated confession could have been raised on direct appeal, so they were res judicata.

II

**{¶18}** The first assignment of error is that the court abused its discretion by denying Montgomery's motion to strike the affidavit of his trial attorney. Montgomery argues that the attorney's statement that he had received and reviewed prior to the plea proceedings all of the evidence described in Montgomery's motion to withdraw his guilty plea violated the attorney-client privilege set forth in R.C. 2317.02(A).

A

**{¶19}** Montgomery claimed his decision to plead guilty resulted from (1) the state's failure to disclose favorable evidence to the defense and (2) his attorneys' failure to investigate both the case and his mental condition that caused him to falsely confess to the murder. Corrected Motion to Withdraw Guilty Plea at 13. The specific claims relating to trial counsel's performance were that they had a duty to investigate the case and that, had they done so, they would have learned of the fabricated details relating to Montgomery's purchase of the gun. Trial counsel would also have learned that the pastor's cell phone had turned up in the hands of someone unaffiliated with the church. Montgomery reasoned that the missing cell phone, viewed in conjunction with the opened lockbox, created the inference that the pastor had been murdered during a robbery. Finally, Montgomery argued that had trial counsel investigated these leads, they would have taken more seriously Montgomery's claims of actual innocence and investigated his mental state when confessing to the murder.

**{¶20}** The trial attorney's affidavit stated in relevant part:

3.  Affiant avers that during the pre-trial discovery process, he and co-counsel received supplemental discovery from the State that included

thirteen pages of Sprint cell phone records. Affiant knew that the cell phone records were those of the victim's cell phone and that the victim's cell phone was on and receiving calls after the victim's death. Additionally, Affiant knew that the person in possession of the victim's cell phone was a neighborhood resident.

4. Affiant avers that he knew the details of the Cleveland Police investigation into the victim's murder, including the investigation into Montgomery's explanation that he purchased the firearm used to murder the victim from a male employee of a local market. Affiant knew that Cleveland Police detectives interviewed the store owner of the market, and that owner denied having an employee matching the description provided by Montgomery. Affiant also knew that the murder weapon was never found.

5. Affiant avers that during the pre-trial discovery, he and co-counsel received discovery from the State that included notice of burnt money being found outside of a strongbox in the fire scene.

6. Affiant avers that the above-stated information was discussed with Montgomery prior to the entry of his guilty pleas.

B

{¶21} In Ohio, the common law attorney-client privilege has been codified in R.C. 2317.02(A). That section forbids an attorney from testifying "concerning a communication made to the attorney by a client in that relation or concerning the attorney's advice to a client * * *." Although R.C. 2317.02(A) does not define the term "communication," that word is understood to encompass "information relating to the representation." *See* Prof.Cond.R. 1.6, comment 2. In this context, the word "representation" is important — the attorney-client privilege exists only when the communication is for the purpose of requesting or receiving legal advice and is intended

to be confidential. *State v. Post*, 32 Ohio St.3d 380, 387, 513 N.E.2d 754 (1987); *Cannell v. Rhodes*, 31 Ohio App.3d 183, 509 N.E.2d 963 (8th Dist.1986).

{¶22} The court incorrectly found that the contents of the trial attorney's affidavit did not relate to "communications" between the trial attorney and Montgomery. The affidavit plainly referred to information relating to counsel's representation of Montgomery. Admittedly, the affidavit did not state precisely what the trial attorney "discussed" with Montgomery. But the affidavit contains details about what the trial attorney knew, so his allegation that he "discussed" those details with Montgomery could only mean that he conveyed the substance of those details to Montgomery. He thus divulged the substance of his communications with Montgomery. By stating that he discussed the subject matter of the affidavit with Montgomery, the trial attorney testified (by sworn affidavit) to attorney-client communications.

C

{¶23} Despite the court's error in finding that the affidavit did not reveal any communications between Montgomery and the trial attorney, the state argues that an exception to the privilege applies in the form of the self-protection exception.

{¶24} The attorney-client privilege set forth in R.C. 2317.02(A) is not absolute: it can be waived by the client and is otherwise subject to exceptions. *Squires, Sanders & Dempsy, L.L.P. v. Givaudan Flavors Corp.*, 127 Ohio St.3d 161, 2010-Ohio-4469, 937 N.E.2d 533, ¶ 47. An exception to the attorney-client privilege means that "the privilege does not attach to the communications in the first instance and is therefore excluded from

the operation of the statute." *Id*. For example, an exception to the attorney-client privilege exists that permits "an attorney to testify concerning attorney-client communications where necessary to establish a claim for legal fees on behalf of the attorney or to defend against a charge of malpractice or other wrongdoing in litigation between the attorney and the client." *Id*., at paragraph one of the syllabus. This has become known as the "self-protection" exception to the attorney-client privilege. *Id.* at ¶ 48.

{¶25} In its opposition to Montgomery's motion to strike the affidavit of trial counsel, the state erroneously relied on the self-protection exception set forth in *Squires, Sanders & Dempsey* to argue that trial counsel had the right to file the affidavit to protect himself against Montgomery's claim of ineffective assistance of counsel. *Squires, Sanders & Dempsey* made it clear that the self-protection exception applies only in "litigation between the attorney and client." A claim of ineffective assistance of counsel is not litigation *between* the attorney and client, so the self-protection exception does not apply in this case.

D

{¶26} Even though the self-protection exception does not expressly apply, the principle behind the exception has been applied in criminal postconviction proceedings to find that a petitioner who raises a Sixth Amendment claim of ineffective assistance of counsel waives the attorney-client privilege as to matters reasonably related to the claim

of inadequate representation. *See State v. Howard*, 2d Dist. Montgomery No. 8001, 1984 Ohio App. LEXIS 8892 (Jan. 4, 1984).

{¶27} In *Johnson v. Alabama*, 256 F.3d 1156 (11th Cir. 2001), the United States Court of Appeals for the Eleventh Circuit recognized that the attorney-client privilege is waived in a habeas corpus proceeding when a defendant asserts a claim of ineffective assistance of counsel. The court stated:

> [W]hen a habeas corpus petitioner * * * launches an attack on the reasonableness of his attorney's strategy in conjunction with a claim of ineffective assistance of counsel, he puts at issue his communications with counsel relating to those strategic choices. As *Strickland [v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984),] itself emphasizes, the "reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, * * * on information supplied by the defendant * * * [and] * * * inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's * * * litigation decisions." 466 U.S. at 691, 104 S.Ct. at 2066; see also *Chandler [v. United States]*, 218 F.3d [1305] at 1318-19 [(11th Cir. 2000)]. ("Because the reasonableness of counsel's acts * * * depends critically upon information supplied by the [petitioner] or the [petitioner's] own statement or actions, evidence of a petitioner's statements and acts in dealing with counsel is highly relevant to ineffective assistance claims." (Citations and internal quotation marks omitted.)). Although the precise boundaries of the waiver will vary from case to case, and in many instances will require careful evaluation by the district court, there should be no confusion that a habeas corpus petitioner alleging that his counsel made unreasonable strategic decisions waives any claim of privilege over the contents of communications with counsel relevant to assessing the reasonableness of those decisions in the circumstances.

*Id*. at 1179.

{¶28} The rationale for the waiver of the attorney-client privilege in postconviction ineffective assistance of counsel claims is that it would be incongruous

that a postconviction petitioner could accuse trial counsel of failing to provide adequate representation, yet invoke the privilege to bar any evidence from the source most likely to contradict that accusation. "Surely a client is not free to make various allegations of misconduct and incompetence while the attorney's lips are sealed by invocation of the attorney-client privilege." *Tasby v. United States*, 504 F.2d 332 at 336 (8th Cir. 1974). "In other words, while a petitioner is free to use the attorney-client privilege as a 'shield,' it is improper to use it as a 'sword' by seeking to deprive an opposing party of material by which that party may defend against the claim raised." *Breton v. Commr. of Correction*, 49 Conn. Supp. 592, 899 A.2d 747 (Sup.Ct.2006).

{¶29} The Ohio rule set forth in *Howard* is consistent with the great weight of cases, both federal and state, finding that a claim of ineffective assistance of counsel in a postconviction proceeding waives the attorney-client privilege with respect to matters relevant to the allegation. *See, e.g., In re Gray*, 123 Cal. App.3d 614, 176 Cal.Rptr. 721 (1981) (stating there is no attorney-client privilege in a habeas corpus proceeding); *State v. Kruchten*, 101 Ariz. 186, 417 P.2d 510 (Ariz. 1966) (finding that a party waived his privilege by asserting in a postconviction proceeding that his counsel was incompetent); *Everett v. Everett*, 319 Mich. 475, 29 N.W.2d 919 (Mich. 1947) (finding the former attorney's affidavit disclosing certain confidential communications to be admissible following the client's motion for new trial on the ground that plaintiff's former counsel was incompetent); *Ex parte Lewis*, 36 So.3d 72 (Ala.Crim. App.2008) (finding a claim of ineffective assistance of counsel in the postconviction proceeding waived the

attorney-client privilege as to matters relevant to his allegations of ineffective assistance of trial counsel); *State v. Walen*, 563 N.W.2d 742 (Minn.1997) (finding that a defendant who claims ineffective assistance of counsel necessarily waives the attorney-client privilege as to all communications relevant to that issue).

E

**{¶30}** Although an ineffective assistance of counsel claim waives the attorney-client privilege, the question remains whether a criminal defense lawyer who is the subject of a former client's ineffective assistance of counsel claim may, without the client's informed consent, disclose confidential information to the state prior to any proceeding on the client's claim in order to help the prosecution establish that the lawyer's representation was competent. Montgomery cites to Formal Opinion 10-456 by the American Bar Association ("ABA") to argue that his trial attorney violated the Rules of Professional Conduct by submitting an affidavit that disclosed confidential information.

**{¶31}** Prof.Cond.R. 1.6 is substantively similar to Rule 1.6 of the American Bar Association Model Rules of Professional Conduct. It states:

> (a) A lawyer shall not reveal information relating to the representation of a client, including information protected by the attorney-client privilege under applicable law, unless the client gives *informed consent*, the disclosure is impliedly authorized in order to carry out the representation, or the disclosure is permitted by division (b) or required by division (c) of this rule.

(Emphasis sic.)

**{¶32}** Prof.Cond.R. 1.6(a) is not absolute. Prof.Cond.R. 1.6(b) states:

A lawyer may reveal information relating to the representation of a client, including information protected by the attorney-client privilege under applicable law, to the extent the lawyer reasonably believes necessary for any of the following purposes:

\* \* \*

(5) to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client, to establish a defense to a criminal charge or civil claim against the lawyer based upon conduct in which the client was involved, or to respond to allegations in any proceeding, including any disciplinary matter, concerning the lawyer's representation of the client[.]

**{¶33}** In Formal Opinion 10-456, the ABA concluded that the first two of the three exceptions to Model Rule 1.6(b)(5) do not apply to postconviction ineffective assistance of counsel claims:  an ineffective assistance of counsel claim is not a claim between a lawyer and client (it is a challenge to the constitutionality of a conviction) nor is a criminal postconviction motion one that the lawyer must defend.  *Id*. at 3-4.  The ABA did find, however, that the third exception applies because an ineffective assistance of counsel claim is one that requires a lawyer "to respond to allegations in any proceeding concerning the lawyer's representation of the client."  *Id*. at 4.

**{¶34}** The ABA concluded that a lawyer may disclose information protected by Model Rule 1.6 to the extent that the lawyer "reasonably believes [it is] necessary" to do so in the lawyer's self-defense, but found it "highly unlikely that a disclosure in response to a prosecution request, prior to a court-supervised response by way of testimony or otherwise, will be justifiable."  *Id*. at 1.  In forming this opinion, the ABA noted that many ineffective assistance of counsel claims are resolved without taking evidence

because of procedural deficiencies or a failure to show actual prejudice that a lawyer would rarely have to act to voluntarily disclose information before required to do so by the court. *Id*. at 5. The ABA found:

> Permitting disclosure of client confidential information outside court-supervised proceedings undermines important interests protected by the confidentiality rule. Because the extent of trial counsel's disclosure to the prosecution would be unsupervised by the court, there would be a risk that trial counsel would disclose information that could not ultimately be disclosed in the adjudicative proceeding.

*Id*. at 5.

{¶35} In other words, the ABA concluded that disclosure of protected information would rarely be necessary outside of court-supervised proceedings and concerns for the lawyer's reputation or other collateral consequences "can almost always be addressed by disclosing relevant client information in a setting subject to judicial supervision." *Id*. In this context, the ABA considered "judicial supervision" to mean a formal proceeding where the client would have the opportunity to object to the disclosure and obtain a judicial ruling. *Id*. at 2.

{¶36} We have no authority to address claimed violations of the Rules of Professional Conduct — that authority rests solely with the Ohio Supreme Court. *State ex rel. Buck v. Maloney*, 102 Ohio St.3d 250, 2004-Ohio-2590, 809 N.E.2d 20. But as even the ABA noted, an ineffective assistance of counsel claim waives the attorney-client privilege as an evidentiary matter. Formal Opinion 10-456 at 1. While it is true that the Rules of Professional Conduct contain confidentiality provisions that are broader than the attorney-client privilege (lawyers must keep a client's "secrets" in addition to any

confidences), violations of the Rules of Professional Conduct have no bearing on the *admissibility* of evidence. "A violation of attorney disciplinary rules is not of constitutional magnitude and consequently suppression is not constitutionally required." *United States v. Guerrerio*, 675 F.Supp. 1430, 1433 (S.D.N.Y.1987). So whether the trial attorney violated the Rules of Professional Conduct by offering an affidavit that disclosed client communications is immaterial to the question of whether that affidavit could be properly admitted against Montgomery's motion to withdraw his guilty plea.

{¶37} Even if we did have the authority to address the substance of Formal Opinion 10-456, we differ with the ABA's opinion that an attorney who is the subject of an ineffective assistance of counsel claim who may have a reasonable need to disclose relevant client information should do so only with prior judicial approval in the proceeding in which the claim is joined.

{¶38} Prof.Cond.R. 1.6(b)(5) does not require any judicial intervention as a prerequisite for disclosing client information. Nevertheless, there are limitations built into Prof.Cond.R. 1.6(b)(5) that act as a safeguard against potential abuse. The rule allows disclosure only "to the extent the lawyer reasonably believes necessary" to respond to the client's allegations. "Reasonably" in this context "denotes the conduct of a reasonably prudent and competent lawyer." Prof.Cond.R. 1.0(I). If a lawyer does choose to disclose information (disclosure is not mandatory), the question becomes how much information should be disclosed. That question is answered by Comment 14 to Prof.Cond.R. 1.6, which states that "[a] disclosure adverse to the client's interest should

be no greater than the lawyer reasonably believes necessary to accomplish the purpose." So even if a lawyer chooses to disclose information in response to a charge of ineffective assistance of counsel, the disclosure must be limited to information that refutes the specific charge. This is not to say that a lawyer should not first seek judicial approval before disclosing information, but only that it is not required by the rule and the very narrow scope of the information allowed to be disclosed suggests that the rule can be enforced without prior judicial intervention.

{¶39} Our opinion is shared by several state bar associations that have addressed ABA Formal Opinion 10-456. In Opinion 364, the District of Columbia Bar Association stated that "we do not share the [ABA's] view that extrajudicial disclosure will not be justifiable." The D.C. Bar Association noted that its Rule 1.6(e)(3), like the Model Rule 1.6(b)(5) and Prof.Cond.R. 1.6(b)(5), "does not require a court order to make the disclosures that the rule permits." The bar association thus concluded:

> D.C. Rule 1.6(e)(3) permits a defense lawyer whose conduct has been placed in issue by a former client's ineffective assistance of counsel [IAC] claim to make, without judicial approval or supervision, such disclosures of information protected by Rule 1.6 as are reasonably necessary to respond to the client's specific allegations about the lawyer's performance. Even so, a lawyer should reflect before making disclosures of protected information to prosecutors, courts, or others. A lawyer's confidentiality obligations to her former client are broader than the attorney-client privilege. Although the

former client's claim likely waives the evidentiary privilege, that alone does not eliminate the broader confidentiality obligation owed under Rule 1.6. Nor does the limited "self-defense" exception to confidentiality in Rule 1.6(e)(3) open the door to unlimited disclosures to prosecutors, courts or others of protected information. The rule allows a lawyer to disclose protected information only to the extent "reasonably necessary" to respond to "specific allegations" by the former client. Reasonableness is a fact-bound issue about which others may later disagree. Lawyers who are uncertain about the permissibility of disclosing protected information in response to an IAC claim should consider seeking independent advice or judicial approval of the disclosure.

*See also* 2011 Formal Ethics Opinion 16 of the North Carolina Bar Association (declining to adopt ABA opinion that would contradict state rule that grants lawyers discretion, without court direction or supervision, to disclose privileged information in response to ineffective assistance of counsel claims in the narrowly-tailored fashion contemplated by the rule); Board of Professional Responsibility of the Supreme Court of Tennessee, Formal Ethics Opinion 2013-F-156 ("the Tennessee Rules of Professional Conduct do not strictly prohibit a former defense lawyer alleged to have rendered ineffective assistance of counsel from providing information to the prosecution prior to or outside an in-court proceeding.").

{¶40} Trial counsel offered a narrowly drafted affidavit to address the specific deficiencies in representation asserted in Montgomery's ineffective assistance of counsel claim. The trial attorney did refer to "communications" between him and Montgomery, but those references were simply that the trial attorney was aware of the allegedly exculpatory material provided by the state and that he discussed that information with his client prior to Montgomery entering his guilty pleas. The affidavit thus disclosed no more information than was necessary to refute Montgomery's specific allegations of deficiencies in the trial attorney's representation relating to his failure to inform Montgomery about possible exculpatory evidence. We have no basis for concluding that the court erred by failing to strike the affidavit.

### III

{¶41} We next consider Montgomery's argument that the court erred by finding the claims raised in the motion to withdraw the guilty plea were res judicata.

### A

{¶42} The usual formulation of res judicata in postconviction proceedings is that it bars the assertion of claims against a valid, final judgment of conviction that have been raised or could have been raised on appeal. *State v. Perry*, 10 Ohio St.2d 175, 226 N.E.2d 104 (1967), paragraph nine of the syllabus. Res judicata does not, however, apply only to direct appeals, but to all postconviction proceedings in which an issue was or could have been raised. Thus, res judicata bars the assertion of claims in a motion to withdraw a guilty plea that were, or could have been, raised in a prior proceeding. *State*

*v. Ketterer*, 126 Ohio St.3d 448, 2010-Ohio-3831, 935 N.E.2d 9, ¶ 59, citing *State v. McGee*, 8th Dist. Cuyahoga No. 91638, 2009-Ohio-3374, ¶ 9.

B

**{¶43}** None of the issues raised in the motion to withdraw the guilty plea could have been raised on direct appeal because they relied on matters outside the record of the guilty plea. They were properly the subject of a postconviction motion. *See State v. Smith*, 17 Ohio St.3d 98, 101, 477 N.E.2d 1128 (1985), fn. 1.

**{¶44}** The issues raised by Montgomery in the motion to withdraw the guilty plea could, however, have been raised in his 2006 petition for postconviction relief. When a party has previously filed a petition for postconviction relief, issues raised in a subsequent motion to withdraw guilty plea that could have been raised in the petition for postconviction relief are res judicata. *See State v. McMinn*, 9th Dist. Medina No. 2927-M, 1999 Ohio App. LEXIS 2745 (June 16, 1999).

**{¶45}** As the court found in its opinion denying the motion to withdraw the guilty plea, Montgomery does not dispute that all of the evidence on which he relies predates his 2006 petition for postconviction relief in which he failed to raise any issue regarding his actual innocence. The centerpiece of Montgomery's argument for actual innocence — that the cell phone records showing the pastor's cell phone had been used following his murder suggested that the pastor had been the victim of a robbery — was something he could have presented long ago in prior proceedings. Those records were provided to trial counsel in September 2003 as part of a supplemental discovery response filed by the state.

As the court found, "Montgomery does not dispute that the records were, in fact, provided to defense counsel."

{¶46} Montgomery complains that the state failed to designate the cell phone records as being exculpatory, but that argument is unavailing. The state's obligation in discovery is to disclose any evidence that might be exculpatory — it is not required to connect the dots for a defendant. In any event, the trial attorney's affidavit made it clear that he received the cell phone records in a supplemental discovery response and knew what those records contained. The trial attorney admitted that the cell phone records showed that "the victim's cell phone was on and receiving calls after the victim's death," and that the trial attorney knew that the person in possession of the cell phone was a neighborhood resident. All of these facts were communicated to Montgomery prior to his guilty plea.

{¶47} Montgomery filed his own affidavit disavowing knowledge of the cell phone records until March 2010. That assertion is not only belied by the trial attorney's affidavit, but by the record itself. We find it inconceivable that Montgomery, having sought DNA testing, having filed a direct appeal, and having filed a petition for postconviction relief — all before March 2010 — was unaware that the cell phone records were a part of the record before he entered his guilty plea. Indeed, Montgomery now concedes that the cell phone records were a part of the trial court record and now complains that the 17 pages of cell phone records were "buried by the State" because they were included with 26 other pages of documents obtained from his attorney's computer.

This is a disingenuous argument because the cell phone records comprised roughly half of the supplemental discovery response. It is difficult to understand how so many records could have been "buried."

{¶48} Finally, Montgomery points out that the trial attorney's affidavit states that he received 13 pages of cell phone records, despite the record showing that the state produced 17 pages of cell phone records. He confirms this discrepancy by claiming that he received his case file from the trial attorney and confirmed that it was missing four pages of the records. One of those missing pages, the first page of the records provided by the state, documented the pastor's last cell phone call made at 12:38 a.m. on the day of his murder.

{¶49} It is unclear why trial counsel's file was missing four pages of cell phone records provided by the state, but that omission is unimportant because the trial court record does contain all 17 pages of cell phone records. Those records were made a part of the record before Montgomery entered his guilty plea, so Montgomery was necessarily charged with knowledge of those records. And to the extent that Montgomery became aware that there was a discrepancy between the cell phone records in his trial attorney's case file and those contained in the trial court record, he admitted that he knew about the discrepancy approximately one year after entering his guilty plea. *See* Defendant's Reply Brief to Motion to Withdraw Guilty Plea, at 6. Given that knowledge, he could have raised that discrepancy in earlier postconviction proceedings, so the issue is res judicata.

{¶50} We reach similar conclusions regarding the remainder of Montgomery's "problems" with the state's case. Trial counsel's affidavit stated that he received and conveyed to Montgomery information relating to all of his claims; notably, the failure to find the murder weapon; the investigation into Montgomery's explanation as to how he obtained the gun he used to shoot the pastor; and the opened lockbox with burned currency found in the pastor's office. The court had no basis for concluding that Montgomery did not know of this information and was so prevented from asserting claims in prior postconviction proceedings. The court did not err by finding the ineffective assistance of counsel claims were barred by res judicata.

IV

{¶51} Montgomery's second and third assignments of error overlap in arguing that we should not apply principles of res judicata because to do so would work an injustice. He maintains that he was unaware of many of the details supporting his claim of actual innocence until after an investigative reporter from the Philadelphia Inquirer interviewed him and others associated with the case to make a compelling argument of actual innocence. He thus argues that his is the extraordinary case in which res judicata should not be applied and the court should have conducted a full hearing on the motion to withdraw the guilty plea.

A

{¶52} In *State v. Simpkins*, 117 Ohio St.3d 420, 2008-Ohio-1197, 884 N.E.2d 568, the Ohio Supreme Court stated:

Res judicata is a rule of fundamental and substantial justice, see *State v. Szefcyk* (1996), 77 Ohio St.3d 93, 95, 1996-Ohio-337, 671 N.E.2d 233, citing *Federated Dept. Stores, Inc. v. Moitie* (1981), 452 U.S. 394, 401, 101 S.Ct. 2424, 69 L.Ed.2d 103, that "'is to be applied in particular situations as fairness and justice require, and that * * * is not to be applied so rigidly as to defeat the ends of justice or so as to work an injustice.'" *Grava v. Parkman Twp.* (1995), 73 Ohio St.3d 379, 386-387, 1995-Ohio-331, 653 N.E.2d 226 (Douglas, J., dissenting), quoting 46 American Jurisprudence 2d (1994) 786-787, Judgments, Section 522, and citing *Goodson v. McDonough Power Equip., Inc.* (1983), 2 Ohio St.3d 193, 202, 2 OBR 732, 443 N.E.2d 978.

*Id.* at ¶ 25.

{¶53} It is important to understand *Simpkins* in the context of its facts. Simpkins pleaded guilty to offenses and was sentenced to a term of incarceration, but was not advised at sentencing that he was subject to postrelease control. Before Simpkins was to be released from prison, the state asked the court to resentence him because the failure to mention postrelease control made the sentence void under *State v. Bezak,* 114 Ohio St.3d 94, 2007-Ohio-3250, 868 N.E.2d 961. Simpkins argued that the issue of postrelease control was res judicata because the state failed to raise it on direct appeal. The Supreme Court refused to find the postrelease control sentencing issue res judicata when it was plain that the trial court had imposed a void sentence. This caused the Supreme Court to conclude that "[t]he interests that underlie res judicata, although critically important, do not override our duty to sentence defendants as required by the law." *Id.* at ¶ 27.

{¶54} In *State v. Tinney*, 5th Dist. Richland No. 2011 CA 41, 2012-Ohio-72, the court of appeals cited *Simpkins* for the proposition that res judicata would not bar a defendant from raising inconsistencies with his various confessions and his mental

competency to confess to certain crimes in a postsentence motion to withdraw a guilty plea. Recognizing that Tinney had raised the issue of his mental competency in two prior motions to withdraw his guilty plea, the court of appeals nonetheless believed that "[t]he confluence in this case of lingering concerns by some police officials of appellee's actual guilt and the issue of appellee's mental competency has, in our minds, at least heightened the possibility of an injustice done to appellee nearly twenty years ago." *Id*. at ¶ 31.

B

**{¶55}** Montgomery argues that his claims are identical to those presented in *Tinney*, so we should follow that case and allow him to withdraw his guilty plea. We disagree. Neither *Simpkins* nor *Tinney* make a convincing case for abandoning application of res judicata in this postconviction proceeding in which the issues Montgomery raises were either raised or could have been raised previously.

**{¶56}** It is unclear why the Supreme Court decided *Simpkins* on the basis of it being unfair to apply res judicata to a void sentence. By the Supreme Court's own precedent, res judicata only applies to a "valid, final judgment of conviction." *Perry, supra*. A sentence that fails to include a mandatory term of postrelease control is void and therefore not a valid, final judgment. Indeed, the Supreme Court has now held that void sentences are "not precluded from appellate review by principles of res judicata, and may be reviewed at any time, on direct appeal or collateral attack." *State v. Fischer*, 128 Ohio St.3d 92, 2010-Ohio-6238, 942 N.E.2d 332, paragraph one of the syllabus. *See*

*also State v. Billiter*, 134 Ohio St.3d 103, 2012-Ohio-5144, 980 N.E.2d 960, syllabus. In light of this subsequent precedent, *Simpkins* should have been (and now would be) decided on the basis of res judicata not applying at all to a void judgment; not that it would be unfair to apply res judicata to bar a party from claiming that a sentence was void.

{¶57} *Tinney* presents a somewhat similar fact pattern to this appeal, but contains so little analysis in its refusal to apply the doctrine of res judicata that we find it unpersuasive.

{¶58} In 1992, Tinney gave multiple confessions to a murder/robbery and then pleaded guilty to those offenses. In postconviction motions, he twice raised the issue of his competency: first in a 1992 motion to withdraw his guilty plea; second in a 2004-2005 motion to withdraw his guilty plea. In rejecting the 2005 motion to withdraw the guilty plea, the trial court found no indication that Tinney was impaired by medication when confessing nor did his conduct give any indication that his plea "was other than voluntary." *Id*. at ¶ 30.

{¶59} In 2009, Tinney filed a third motion to withdraw his guilty plea. The motion contained arguments relating to Tinney's competency at the time he entered his plea, but also contained a new psychological report and profile. The profile stated that Tinney suffered from major depressive disorder and a borderline antisocial personality traits that "appear[ ] to be persistent and ha[ve] a chronic course that will manifest * * * throughout his life." *Id*. at ¶ 29. This caused the experts to conclude that Tinney "might

engage in impulsive masochistic acts such as falsely confessing to a crime while experiencing symptoms of an actively decompensated depressed (and possibly psychotic) state." *Id.* The trial court granted Tinney's motion to withdraw the guilty plea over the state's objections that his competency claims were res judicata. Citing precedent for the proposition that the doctrine of res judicata is not to be applied so as to work an injustice, the court of appeals concluded that a psychological profile relating to Tinney's competency "heightened the possibility of an injustice" done at the time Tinney entered his guilty plea and refused to find the competency claims contained in the third motion to withdraw the guilty plea were res judicata. *Id.* at ¶ 31. It did, however, remand the case to the trial court for the purpose of conducting a hearing on the motion to withdraw the plea.

C

**{¶60}** Even if *Tinney* is viable precedent for the proposition that the doctrine of res judicata should not be applied when doing so would create an injustice, no such injustice exists in this case.

1

**{¶61}** Because this is a postsentence motion to withdraw a guilty plea, we apply Crim.R. 32.1, that permits a criminal defendant to withdraw a plea after the imposition of sentence only to correct a "manifest injustice." A manifest injustice has been defined as a "clear or openly unjust act." *State ex rel. Schneider v. Kreiner*, 83 Ohio St.3d 203, 208, 1998-Ohio-271, 699 N.E.2d 83. Under the manifest injustice standard, a postsentence

withdrawal motion is allowable only in extraordinary cases. *State v. Smith*, 49 Ohio St.2d 261, 264, 361 N.E.2d 1324 (1977). "A motion made pursuant to Crim.R. 32.1 is addressed to the sound discretion of the trial court, and the good faith, credibility and weight of the movant's assertions in support of the motion are matters to be resolved by that court." *Id.*, at paragraph two of the syllabus. We therefore review a trial court's refusal to allow a postsentence motion to withdraw a guilty plea for an abuse of discretion. *State v. Xie*, 62 Ohio St.3d 521, 527, 584 N.E.2d 715 (1992).

2

{¶62} We need not decide whether the preventing an "injustice" standard for not applying the doctrine of res judicata is equivalent to the "manifest injustice" standard employed for granting postsentence motions to withdraw guilty pleas — under either standard, Montgomery has failed to prove either that it would be unjust to apply the doctrine of res judicata or that he showed grounds to conclude that a refusal to allow him to withdraw his guilty plea was necessary to prevent a manifest injustice.

{¶63} Montgomery premised his motion to withdraw his guilty plea on grounds of actual innocence, but offered no evidence that actually proved his innocence. Having pleaded guilty to murder and arson, the presumption of innocence is no longer present. In seeking postconviction relief, Montgomery seeks to "upset the prior determination of guilt," *Ross v. Moffit*, 417 U.S. 600, 611, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974), so he is presumed guilty and therefore obligated to offer more than just the possibility that he

pleaded guilty to a crime that he did not commit. This was especially so when he had both motive and opportunity to commit murder and arson.

{¶64} Not only was Montgomery to be transferred from St. Stanislaus, it appears that he was aware he would be dismissed from the Franciscan Order. In personal journal entries written a few weeks before the murder, Montgomery wrote that he was "so mother fucking pissed off" at being told to leave St. Stanislaus and that "my life is becoming a living hell." In his written confession, he told the police that he was "so angry and enraged" by his transfer that "I wanted to hurt someone." Given his state of mind, Montgomery had a motive to commit murder.

{¶65} Montgomery also had a clear opportunity to commit the murder. He lived in the church rectory, a floor above the pastor's office, so he had easy access to the pastor's office. In addition, he likely would have known who was present in the rectory at the time, thus ensuring the lack of any witnesses.

{¶66} It is true that the police were unable to locate the murder weapon, but Montgomery knew that before he pleaded guilty. He wrote his trial attorney before entering his guilty plea and said: "There is no truth whatsoever to my claim that I purchased a gun at [the convenience store] on 12/06/02. I believe the statement from the owner will verify this." So Montgomery entered his guilty plea knowing that he lied to the police in his confession.

{¶67} This brings us to the major deficiency with Montgomery's argument: he entered his guilty plea despite claiming that he fabricated his confession. Montgomery

sent several letters to his trial attorney in which he said he falsely confessed to the murder. In one letter, Montgomery asked to meet again with the psychiatrist who examined him shortly after the murder, saying that he wished to review his mental health history, including a "lifetime of people pleasing any lying by telling people what I think they want to hear." In another letter, he wrote:

> I was in a state of schizophrenia that produced severe delusions in my thinking, causing me to make false statements on 12/08/02 at the police interrogation. At that time I was suffering from delusions of grandeur that perhaps if I was no longer to be a Franciscan, then I was to be a martyr for a sinner, the killer and arsonist who committed the crime I was charged with. I gave my statements to the police in such a way that they could convict me.

{¶68} Before entering his guilty plea, Montgomery wrote his trial attorney to say that "I wish to take this case to trial and I do not want to plea bargain * * * I am firmly convinced that I must plead my innocence and follow God's law which is above human law." Just one month before pleading guilty, Montgomery continued to insist that he did not wish to pursue a plea bargain and that nothing his attorney "can say or do will change my mind."

{¶69} But he did enter a guilty plea. And that plea was not rushed — ten months elapsed between his confession to the murder and the guilty plea. Despite claiming his innocence to his trial attorney, Montgomery, a highly educated person, pleaded guilty consistent with his confession, telling the court that he understood the consequences of his guilty plea. We view the recantation of a confession with "extreme suspicion." *Williams v. Coyle*, 260 F.3d 684, 708 (6th Cir.2001), quoting *United States v. Chambers*, 944 F.2d 1253, 1264 (6th Cir.1991), so we can only conclude that Montgomery had a

change of heart about entering his guilty plea. A "change of heart" is "insufficient justification for the withdrawal of a guilty plea." *State v. Johnson*, 8th Dist. Cuyahoga No. 83350, 2004-Ohio-2012, ¶ 38, citing *State v. Lambros*, 44 Ohio App.3d 102, 103, 541 N.E.2d 632 (8th Dist.1988).

{¶70} We therefore find that Montgomery cannot convincingly argue that his confession and guilty pleas were the product of trial counsel's failure to investigate. No manifest injustice has been shown. The court did not abuse its discretion by denying the motion to withdraw the guilty plea.

{¶71} Judgment affirmed.

It is ordered that appellee recover of appellant its costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution. A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MELODY J. STEWART, ADMINISTRATIVE JUDGE

LARRY A. JONES, SR., J., and
EILEEN A. GALLAGHER, J., CONCUR