[Cite as *State v. Sabovich*, 2020-Ohio-908.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 108196 |
| v. | : | |
| LISA SABOVICH, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** March 12, 2020

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-07-494079-A

***Appearances:***

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Daniel T. Van, Assistant Prosecuting Attorney, *for appellee.*

Mark A. Stanton, Cuyahoga County Public Defender, and Robert McCaleb, Assistant Public Defender, *for appellant.*

EILEEN A. GALLAGHER, J.:

{¶ 1} In 2007, defendant-appellant Lisa Sabovich pleaded guilty to aggravated assault, a fourth-degree felony and domestic violence, a first-degree misdemeanor. In so doing, Sabovich admitted that she attacked and injured her

then-girlfriend, K.C., with a knife. The trial court sentenced Sabovich to a community control sanction for 18 months. She did not directly appeal and completed her sentence in 2008. In 2018, Sabovich filed a motion to withdraw her guilty plea, claiming that she did not attack K.C. and that she and her life had been unfairly hindered by the convictions. After a full hearing, the trial court denied the motion. We affirm.

**Assignment of Error**

{¶ 2} Sabovich assigns one error:

> The trial court abused its discretion when it denied Ms. Sabovich's motion without analyzing the specific facts of this case.

**Factual Background and Procedural History**

{¶ 3} In Sabovich's 2018 motion to withdraw her guilty plea, she claimed that she suffered manifest injustice because she was convicted of crimes for which she was "innocent of the charges" and further, that the collateral consequences of those convictions continue to cause her "inordinate difficulty." Sabovich asserted that these convictions have effectively prevented her from pursuing further education, obtaining suitable housing and finding stable employment.

{¶ 4} In affidavits attached to the motion as well as testimony presented at the hearing, Sabovich offered evidence about her relationship with K.C. and a February 23, 2007 incident that sent K.C. to the hospital with multiple knife injuries and predicated Sabovich's convictions.[1] Sabovich and K.C. had met several years

---

[1] Sabovich attached two affidavits to her motion, one executed by K.C. and one which she executed. Both K.C. and Sabovich averred that K.C.'s knife injuries occurred

earlier in California and became romantically involved. K.C. subsequently moved to Cleveland, Ohio to attend medical school with Sabovich following and the two began to cohabitate.

**{¶ 5}** In her testimony at the hearing, K.C. explained that although "everything went well for a while," both she and Sabovich became addicted to heroin. In her testimony, Sabovich detailed how the relationship "wasn't healthy." She described it as "incredibly dysfunctional" and "very, very codependent."

**{¶ 6}** Sabovich stated that she and K.C. used the drug together for a "couple years." Sabovich claimed she began using heroin after she ran out of pain medication which she was prescribed following a surgery. K.C. explained that she experienced "academic difficulties" in medical school, including failing a clinical rotation. K.C. stated that she began using methamphetamine "to stay up and study" and then heroin to "cope." Sabovich explained that K.C. would use heroin to "come down" from and counteract the methamphetamine. K.C. stated that it was not long before she was no longer "able to continue" medical school. K.C. was arrested for drug possession. She sought drug treatment but admitted that she "was unable to finish the program" and that she "fell into a deep depression." The drug use continued.

---

on February 25, 2007. At the hearing both women testified and clarified that the incident actually occurred two days earlier on February 23, which is consistent with other evidence.

{¶ 7} K.C. testified that it was common for Sabovich and her to argue and to fight over drugs and that they had "a lot of screaming matches." There were also physical altercations that K.C. described as "non-friendly wrestling."

{¶ 8} On February 23, 2007, one such "altercation" resulted in K.C. sustaining multiple knife wounds to her legs and buttocks. K.C. described the incident the following day in her police statement:

> I was sleeping, Lisa woke me up because she could not find her wallet and I think there was some money missing from her wallet. She also thought I did her Heroin but I saw her sit down with a full needle. She passed out and later woke up and saw it missing and thought I did it. She demanded the truth that I took it. I tried to calm her down. My attempts to calm her down were not working and she started kicking me. At this point she bit me on my head. I started packing up my stuff because I did not want to get hurt anymore. Lisa thought I was trying to run off with all her stuff. Lisa and I got into a physical altercation where there was a lot of hair pulling, biting and scratching. Lisa went to the kitchen and got a knife. She came back to the living room with the knife and was threatening me with it. * * * I said something along the lines of you make me sick! Lisa picked up the knife and cut me with it on the knee first. I turned to leave and she stuck me in my buttocks. I saw all of the blood, took off my pants and ran outside. * * * Lisa came outside and said it was ok, I called for an ambulance. I went back in the house and waited for EMS to arrive. While we were waiting she showed remorse for her actions and tried to care for my wounds. * * *

{¶ 9} K.C.'s statement was supported by more than 20 police photographs of the scene taken both inside and outside the house, the police incident report and K.C.'s medical records from her treatment.

{¶ 10} At the hearing, both Sabovich and K.C. reviewed the photographs. The photographs from inside the house depicted multiple rooms containing bloody carpets, a blood-soaked mattress and a wall with a bloody handprint on it. Sabovich

testified that she remembered seeing "a lot of blood" in the house. The photographs taken outside of the house depict a trail of blood leading out of the house. After she reviewed the photographs K.C. remarked "I don't remember there being quite that much blood. It's quite a large amount of blood."

{¶ 11} When paramedics arrived on the scene they rushed K.C. to the hospital for treatment where police first interviewed her. The police report reflects that K.C. appeared "groggy" and was "only able to state that her live in [sic.] girlfriend of 9 yrs. 5 yrs [sic.] stabbed her * * *." The report further indicates that the officer observed K.C. "was also bitten but was unable to answer questions about it at the hospital due to being groggy."

{¶ 12} K.C.'s medical records further support her police statement. They reflect that K.C. was admitted to the hospital for treatment after "sustaining two stabs to the left buttocks and thigh and one laceration to the left knee." K.C. reported to doctors that she was "fighting with her friend when she was stabbed by her friend." K.C.'s records also refer to "[m]ultiple reported bite marks to the face."

{¶ 13} The records further reflect that, at the hospital, K.C. reported that she had taken "multiple" Klonopin pills and that there was "questionable suicidality." The records specified that K.C. "stated she took the [K]lonopin in a suicide attempt."

{¶ 14} This evidence was presented at the hearing on the motion. After the hearing, the court denied the motion. Sabovich appeals that denial.

**Law and Analysis**

**Motion to Withdraw Guilty Plea**

{¶ 15} Crim.R. 32.1 provides the basis by which a defendant may seek to withdraw a guilty plea:

> A motion to withdraw a plea of guilty * * * may be made only before sentence is imposed; but to correct manifest injustice the court after sentence may set aside the judgment of conviction and permit the defendant to withdraw his or her plea.

{¶ 16} The rule creates a distinction between an attempt to withdraw a plea before sentencing and a subsequent attempt to do so, imposing a substantially more onerous burden on the latter. *Compare State v. Xie*, 62 Ohio St.3d 521, 529, 584 N.E.2d 716 (1992) ("[A] presentence motion to withdraw a guilty plea should be freely and liberally granted") *with State v. Montgomery*, 2013-Ohio-4193, 997 N.E.2d 579, ¶ 61 (8th Dist.) ("[A] postsentence withdrawal motion is allowable only in extraordinary cases.").

{¶ 17} The Supreme Court has defined "manifest injustice" as a "clear or openly unjust act." *State ex rel. Schneider v. Kreiner*, 83 Ohio St.3d 203, 208, 699 N.E.2d 83 (1998). A manifest injustice "results in a miscarriage of justice or is inconsistent with the demands of due process." *State v. Stovall*, 8th Dist. Cuyahoga No. 104787, 2017-Ohio-2661, ¶ 17, quoting *State v. Williams*, 10th Dist. Franklin No. 03AP-1214, 2004-Ohio-6123, ¶ 5.

{¶ 18} This court has observed that there is no absolute right to withdraw a guilty plea. *State v. Peterseim*, 68 Ohio App.2d 211, 214, 428 N.E.2d 863 (8th

Dist.1980), citing *Barker v. United States*, 579 F.2d 1219, 1223 (10th Cir.1978). To the contrary, it is the defendant seeking to withdraw his or her plea after sentencing who bears the burden of establishing manifest injustice. *State v. Smith*, 49 Ohio St.2d 261, 361 N.E.2d 1324 (1977), paragraph one of the syllabus. A defendant evidences manifest injustice with reference to specific facts in the record or via affidavit submitted with a Crim.R. 32.1 motion. *State v. Geraci*, 8th Dist. Cuyahoga Nos. 101946 and 101947, 2015-Ohio-2699, ¶ 9-10. Even where a defendant establishes manifest injustice, the trial court may nonetheless, in its discretion, still deny the motion. *See* Crim.R. 32.1. As the Supreme Court has cautioned, "a postsentence withdrawal motion is allowable only in extraordinary cases." *Smith* at 264, citing *United States v. Semel*, 347 F.2d 228 (4th Cir.1965).

{¶ 19} Crim.R. 32.1 thus vests the trial court with substantial discretion to vacate a guilty plea. *Smith* at paragraph two of the syllabus. ("A motion made pursuant to Crim.R. 32.1 is addressed to the sound discretion of the trial court, and the good faith, credibility and weight of the movant's assertions in support of the motion are matters to be resolved by that court."). We will not reverse such a decision absent abuse of that discretion. *State v. Grant*, 8th Dist. Cuyahoga No. 107499, 2019-Ohio-796, ¶ 13.

{¶ 20} An abuse of discretion "connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980), citing *Steiner v. Custer*, 137 Ohio St. 448, 31 N.E.2d 855 (1940). It involves "far

more than a difference in opinion" and implicates "not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias." *State v. Jenkins*, 15 Ohio St.3d 164, 222, 473 N.E.2d 264 (1984), quoting *Spalding v. Spalding*, 355 Mich. 382, 384-385, 94 N.W.2d 810 (1959).

{¶ 21} As noted, Sabovich did not directly appeal; as such we have jurisdiction to consider the merits of her claim. *See Grant* at ¶ 14 ("[A] trial court has no jurisdiction to consider a defendant's motion to withdraw his or her guilty pleas under Crim.R. 32.1 after a court of appeals has affirmed the defendant's convictions.").

**Sabovich's Motion**

{¶ 22} In her Crim.R. 32.1 motion, Sabovich asserted she was in possession of new evidence, namely K.C.'s affidavit, which she argued established that K.C. fabricated the allegations against her and proved her innocence. Sabovich insisted that she pleaded guilty solely based on "the weight of [K.C.'s] false allegations and the possibility of jail time." Sabovich argued that she suffered manifest injustice because she continues to suffer the collateral consequences of her convictions, despite K.C.'s affidavit, which undercuts the basis for the convictions in the first place. She further claimed that K.C. had recently come forward to "make amends" and had done so of her own accord.

**Affidavits and Testimony**

{¶ 23} We initially note that we disagree with Sabovich's assertion that K.C.'s affidavit establishes that she was "innocent of the charges against her." Even

assuming that K.C.'s recollection of the incident as stated in her affidavit is true, that recollection is nevertheless incomplete and falls short of exonerating Sabovich. At best, K.C.'s affidavit establishes merely that K.C. does not know who caused her knife injures. In relevant part, K.C. stated in her affidavit:

> 5. My suicide attempt [via ingesting approximately 50 Klonopin pills] was not successful, and a few hours later I woke up in a fog. Intent on ending my life, I got a knife from the kitchen. Although I was intoxicated from the clonazepam [Klonopin] at the time, and my memory is hazy, I remember getting the knife and threatening to stab myself. Lisa was home at the time and attempted to disarm me. During the struggle, I was cut on the legs. After seeing the extent of my injuries, Lisa called 911.

{¶ 24} As noted, K.C. testified at the hearing. Her testimony similarly failed to establish who caused her knife injuries and instead underscored that K.C. simply does not know. During direct examination K.C. explained how she ingested the pills and locked herself in a closet. She stated that when she "came to," she ran to the kitchen and picked up a knife, and threatened to hurt herself with it:

> I went from the kitchen to the living room with the knife. I don't remember what happened after threatening to use it on myself. I think there was a scuffle over the knife, but I don't recall. The next thing that I remember was looking down at my legs and there was blood everywhere.

During cross-examination, K.C. further expounded upon her recollection of that evening:

> Q. So take me through what happened then after you wake up from the banging in the closet.
>
> A. I went to the kitchen and got the knife.
>
> Q. What did you do with the knife?

A. I took it to the living room. I was threatening to use it on myself but I don't remember what my intention was to do with it.

Q. Do you remember how you were holding it?

A. I don't remember how I was holding it.

Q. And do you remember being stabbed?

A. No, I don't.

Q. Do you remember — what do you remember next after holding the knife?

A. The next thing I remember was being in pain and looking down and seeing all the blood.

* * *

Q. So you said during the struggle you were cut on your legs?

A. Yes.

Q. Do you remember the struggle with the knife?

A. No, I don't remember it specifically.

Q. You don't remember the struggle with the knife?

A. No.

{¶ 25} Before the hearing concluded the court sought clarification from the parties as to K.C.'s recollection of the incident:

The Court: I just want to make sure that I have facts correct in my mind, and if you want to make any corrections, you can.

* * *

[K.C.'s affidavit] states in paragraph 5 that, "Lisa was home at the time and attempted to disarm me."

I don't recall any testimony to that fact. Instead she did state that during the altercation with the knife, that was hazy. She doesn't

remember what happened, or who cut whom.  So the truth that is put forth by the Court is that during that time [K.C.] doesn't remember exactly what happened.

[Counsel]:   Your Honor, I think that's correct.  I think that she made clear in her testimony that her intent when she grabbed the knife was to kill herself, but that she does not remember what happened afterwards.  I think that's fair.

[The State]: That's the State's position as well, Your Honor, that she doesn't remember what happened.

{¶ 26} We acknowledge that K.C.'s affidavit does include the statements that "I told the police that Lisa stabbed me.  That was not true * * *."  However, in light of K.C.'s clear and admitted inability to recall how she was injured, such statements merely impact her credibility.  Sabovich's own affidavit attempts to address this critical information gap:

Determined to take the knife away from [K.C.] and save her life, I grabbed the handle of the knife and tried to pull it out of her hands.  [K.C.] was stronger than me, and as she pulled the knife towards herself, it hit her in the hip and leg several times.

*But see State v. Smith*, 49 Ohio St.2d 261, 361 N.E.2d 1324 (1977), paragraph two of the syllabus ("[T]he good faith, credibility and weight of the movant's assertions in support of the motion are matters to be resolved by [the trial] court.").

**Trial Court Denial**

{¶ 27} The trial court rejected Sabovich's claims and denied her motion following a hearing.  As related to K.C.'s recollection of events, the court recognized that "[a]t the time of the incident, [K.C.] provided officers with very specific details to account for her injuries," and then compared that to her testimony at the hearing, noting that "she cannot recall the events surrounding the use of the knife and was

unsure of who cut whom." The court also expressly found that Sabovich's relevant testimony was not credible.

{¶ 28} Based on the evidence, we cannot conclude that the trial court abused its discretion by denying Sabovich's motion because Sabovich did not establish manifest injustice. As discussed, Sabovich's manifest injustice claim is predicated on her assumption that K.C.'s affidavit establishes that Sabovich did not cause K.C.'s injuries. Again, this assumption is simply not born by the evidence. Issues of K.C.'s credibility aside, her claim is far from the silver bullet that Sabovich asserts it is. At best, K.C.'s affidavit and testimony establish that she is not sure how she sustained the knife injuries. It does not show Sabovich was not the person who cut K.C.

{¶ 29} Sabovich's affidavit and testimony do not change the calculus. Although Sabovich's account may be more specific and conclusive as to how K.C. arrived at her injuries than K.C.'s account, for multiple reasons it is nevertheless suspect.

{¶ 30} Fundamentally, the self-serving nature of Sabovich's account is problematic. *See State v. Norris*, 8th Dist. Cuyahoga No. 107894, 2019-Ohio-3768, ¶ 24 ("A self-serving affidavit by the moving party, in and of itself, is generally insufficient to demonstrate manifest injustice."), *but see State v. Carter*, 8th Dist. Cuyahoga No. 104351, 2016-Ohio-8150, ¶ 13 (recognizing self-serving affidavits "present credibility issues," and are "more or less credible depending on the circumstances of the case and facts in the record").

**{¶ 31}** Putting this concern aside, there are other problems with Sabovich's account of the incident. For example, assuming Sabovich's claims are true, namely, that she was not trying to harm K.C. and was instead trying to take the knife from K.C., this account simply does not square with K.C.'s injuries. Sabovich in no way explains how K.C. was stabbed multiple times in her buttocks. These injuries appear to be wholly inconsistent with Sabovich's claim that she was attempting to "save" K.C. Sabovich has articulated no basis by which to conclude otherwise. The trial court recognized as much in its journal entry, noting that "suffering a knife wound on the buttock as a result of a wrestling match is highly suspect." Moreover, Sabovich's own ability to perceive the incident is also questionable in light of her admission that she "had been using heroin" that day.

**{¶ 32}** Additionally, to the extent that Sabovich complains that she is plagued by the collateral consequences of her felony conviction, she fails to distinguish herself from any other person with a felony conviction. *But see State v. Stovall*, 8th Dist. Cuyahoga No. 104787, 2017-Ohio-2661, ¶ 17, quoting *State v. Williams*, 10th Dist. Franklin No. 03AP-1214, 2004-Ohio-6123, ¶ 5 ("Manifest injustice relates to some fundamental flaw in the proceedings which results in a miscarriage of justice or is inconsistent with the demands of due process."). The trial court was within its discretion to deny the motion.

**Argument on Appeal**

**{¶ 33}** On appeal, Sabovich argues that the court abused its discretion because it denied the motion "without analyzing the specific facts of this case." In

support of this claim, Sabovich challenges two of the several "factors" listed in the journal entry that the court considered when evaluating the motion: (1) the "undue delay" of "approximately ten years" between K.C.'s recantation and Sabovich's motion and (2) "[r]ecantations of domestic violence victims are not unusual and are highly suspect." Sabovich additionally claims that the court abused its discretion because it did not consider a consequence of granting the motion. We reject each challenge in turn.

{¶ 34} Sabovich disputes the court's characterization of the delay in filing her motion as "undue." She complains that it was neither "undue" nor "unreasonable" based on the "circumstances." In this case, however, consideration of whether the motion was timely is irrelevant to the disposition of its merits. As discussed, Sabovich failed to demonstrate manifest injustice, irrespective of whether she was timely in so doing.

{¶ 35} Nevertheless, Sabovich claims that the court erred by characterizing the delay as "undue." She claims she filed her motion "about a year" after she learned "definitively" that K.C. wanted to change her story. Because her claim was predicated on K.C.'s recantation, she argues that it would have been futile to file the motion before K.C. was ready to cooperate. We note that K.C.'s affidavit contains the statement that she had the desire to "come clean" about her false accusations against Sabovich in 2007 "a few weeks" after she made them and, further, that she discussed this with Sabovich's attorney before Sabovich pleaded guilty, telling

counsel that her statement "was not entirely accurate * * *."[2]  Apparently, the trial court considered this to be K.C.'s recantation.  As such, and as the trial court stated, there would have been "approximately ten years" between this point and Sabovich's 2018 motion.  Accordingly, even if timeliness were relevant here, we find no abuse of discretion in the court's calculation.

{¶ 36} Sabovich also claims that the trial court abused its discretion to the extent it observed that it is not unusual for domestic violence victims to recant and that such recantations are thus "highly suspect."  Here, K.C.'s underlying motivation for recanting is irrelevant.  As discussed, K.C.'s statements do not establish a manifest injustice, regardless of what motivated her to make them in the first place.  Put differently, the truth-value of K.C.'s statements is irrelevant where the statements fail to establish that Sabovich did not attack K.C.

{¶ 37} Sabovich argues that this case is different from other domestic violence cases in that she is no longer in a relationship with K.C. and, therefore, K.C. has had no motivation to lie.  Moreover she notes that K.C. traveled from California to testify at the hearing and did so at her own expense as further indication that there was no attempt to improperly influence K.C.  Sabovich's arguments miss the point.  Regardless of whether K.C.'s statements in her affidavit are true, they fail to establish that Sabovich did not cut K.C.

---

[2] We note that Sabovich does not articulate, nor do we find any indication in the record to support an ineffective assistance of counsel claim.

{¶ 38} Nevertheless, Sabovich draws the wrong conclusion from K.C.'s uncertainty. She disregards this uncertainty as being "hardly surprising" because K.C. "had taken a large amount of pills, nearly died, and was in an extremely charged mental and emotional state." Instead, she focuses on K.C.'s more decisive averment that her statement to police that Sabovich stabbed her "was not true." In so doing, Sabovich views that averment in a vacuum rather than recognizing that more fundamentally, it exists in the context of K.C.'s admission that she has no idea who inflicted the wounds.

{¶ 39} Finally, Sabovich claims that the trial court abused its discretion because it did not consider a consequence of granting the motion. She claims that if the court would have granted the motion it "would not threaten the interests protected by [Crim.R. 32.1]." However, she provides no basis of support for this contention. We will not infer one for her. *See* App.R. 16(A)(7).

{¶ 40} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry out this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, JUDGE

EILEEN T. GALLAGHER, A.J., and
ANITA LASTER MAYS, J., CONCUR